**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Charles J. MILLER,**
**Defendant-Appellant.**

No. 10994.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 2, 1979.

Motion for Rehearing or for Transfer to Supreme Court Denied Oct. 16, 1979.

Application to Transfer Denied Nov. 14, 1979.

John D. Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

A. L. Shortridge, Joplin, for defendant-appellant.

MAUS, Judge.

The defendant was charged with possession of amphetamines. After a two-day trial, he was found guilty and sentenced to three years imprisonment in accordance with the verdict of the jury. The defendant argues four points on appeal, one of which is the sufficiency of the evidence.

A summary of the facts will be facilitated by the identification of the principals. The defendant was a deputy sheriff with long experience in security and law enforcement. Charles A. Goodwin was chief deputy sheriff. B. W. Forney and Larry Fuhr were also deputy sheriffs, assigned to criminal investigation. David W. Richardson was news director of a local television station. He was a friend of Goodwin. Judy Ryan was a young woman, 24 years of age, and an acquaintance of Richardson.

This case, as most cases do, presents some inconsistencies and conflicts in testimony. This is true not only in respect to the testimony of opposing witnesses, but in respect to the testimony of witnesses called by the same side. However, it is not the function of this court to weigh the evidence and sift out those conflicts and inconsistencies. That is the province of the jury. The jury has announced its determination of the facts by the verdict of guilty. It is for this reason that we must review the evidence most favorable to the state and consider favorable inferences drawn therefrom rejecting the evidence to the contrary. *State v. Evans*, 545 S.W.2d 694 (Mo.App.1976);

*State v. McNeal*, 539 S.W.2d 722 (Mo.App. 1976).

The defendant first became acquainted with Judy when he, along with other officers, served a search warrant at a home Judy was visiting. He said he subsequently saw her at the city jail when she was making a complaint or an inquiry. The defendant stated at this time she solicited marijuana from him and offered him a girl. She did not remember this incident. The defendant and Judy had further contact when the defendant on several occasions brought prisoners to a house where Judy was present. According to Judy, the purpose of at least some of these visits was for the prisoner to visit his girl friend. Also, according to Judy, on some of the visits the defendant supplied beer and vodka and on one occasion joined in smoking marijuana. The defendant had further contact with Judy when she accompanied Richardson to the courthouse to see about recovering her stereo which was being held by the sheriff's office as evidence. While she was waiting in an outer office, according to Judy the defendant asked her to step into an adjoining room. There, the defendant showed her a small bag of mini-whites. At his repeated urging she took a few and he said that there were a lot more where they came from and if she wanted more, "he had a hundred for me and when I was ready, we would make an exchange." He did not directly ask her to have sexual intercourse with him. He did suggest the exchange could be made at a small rural community. He told her to call when she was ready to make the exchange. In reference to the pills, approximately 9,000 to 10,000 at least similar, if not identical, pills were being held in a corn flakes box in the sheriff's office.

Judy gave the pills to Richardson and they discussed the incident with Goodwin. Goodwin discussed the incident and other reports with the sheriff. The sheriff instructed him to investigate the defendant's activities.

While there was no direct testimony, apparently plans were developed to test the defendant through Judy. Final arrangements were made at a meeting held at the television station early in the morning on April 30, 1976. Participating in the meeting were Goodwin, Forney, Fuhr and Richardson. Judy attended the meeting accompanied by her friend Susan Balleau. At the time of trial Susan Balleau had been killed in a car accident. After the meeting the group repaired to a home whose use had been arranged by Susan. From there, again in the early morning, Judy called the defendant and told him she was ready to make the exchange and gave him the address. At approximately 10:20 a. m. the defendant arrived. There was a discussion about the pills and why defendant wanted to go to bed with Judy. To the latter inquiry he replied because she appealed to him. He said he had to investigate a burglary, but would come back. Shortly before noon he returned. As they were upon his previous arrival, Richardson and Forney were hidden upstairs and Goodwin and Fuhr were in a bathroom adjoining the sitting room. A tape recorder had been placed under a couch in that room. The defendant entered and took from his pocket an envelope which he laid on a coffee table. Judy asked if it was all there and defendant said yes. When she asked if he was sure, he picked up the envelope and tore it open, displayed the pills and returned the envelope to the coffee table. The envelope was accompanied by defendant's business card on the reverse side of which had been written "Tom Jones." When the envelope was returned to the table, the officers emerged and defendant was arrested. As will be discussed in more detail, tests were performed on one of the pills and on the dust from the envelope with the result of the identification of amphetamine.

The defendant steadfastly denied his guilt. When arrested, he stated that he was trying to get some information. He repeated that explanation when he was questioned by the sheriff. However, it was not until later that he explained that the pills were vitamins (similar in appearance to the corn flakes box pills) that he had purchased at a drug store. The defendant

attacks the credibility not only of Judy, but of Goodwin, Forney and Fuhr. The primary thrust of this attack was centered on the fact that Goodwin on April 29 filed for sheriff and the defendant had previously told him he could not support him. He also asserted that he had done such an outstanding job that the other deputies resented him. He also directly attacked the credibility of yet another deputy, Gary Smith. While the defendant denied the same, Gary Smith testified that, at defendant's request, he went to defendant's home where the defendant asked him to dispose of the evidence being held against him which was in the safe at the courthouse.

The defendant has placed emphasis upon an inconsistency in the description of the envelope involved. Judy testified in her deposition and at trial the envelope defendant took from his pocket was white. Defendant testified it was white. All others testified it was blue. The envelope in evidence is in fact a light blue. The defendant insists that this inconsistency means that there were two envelopes; a white one produced by defendant and a blue one containing the pills in question and produced by some other person. This argument ignores the right of the jury to determine that Judy and the deputy sheriffs were talking about the same envelope, which Judy described as a different color. The jury's determination is supported by the evidence. Referring to the envelope defendant had taken from his pocket, Judy clearly testified that that envelope was on the table when the deputies came from the bathroom. The defendant's testimony established that as he folded the envelope which he had torn open, the bathroom door opened and he laid the envelope on the coffee table. The defendant denied that he had blue envelopes in his possession. The testimony of Deputy Fuhr established that blue envelopes, at least similar to the one in question, were found in the front and in the trunk of defendant's automobile.

■ The defendant's explanation, his attack upon the credibility of the state's witnesses and his emphasis upon the inconsistencies were all vigorously and ably presented to the jury. The jury resolved these issues against him and their resolution is supported by the evidence. "It was the jury's province to resolve any conflicts in the evidence." *State v. Smart,* 328 S.W.2d 569, 573 (Mo.1959). This court has no authority to determine otherwise.

■ The defendant insists that the state did not present evidence sufficient to support a determination that the pills contained amphetamine. As stated, the envelope contained approximately 100 pills. A qualified chemist performed three tests upon a pill and upon a quantity of dust from the envelope. The tests demonstrated the substances contained a mixture of amphetamine and caffeine. He did not perform a quantitative analysis to determine the relative proportion that was amphetamine. On cross-examination the chemist admitted the proportion could have been ½ % amphetamine and 99½% caffeine. But, the chemist stated that amphetamine is distinctive because of its molecular structure; that it is inappropriate to refer to the strength of amphetamine. A molecule of amphetamine is a molecule of amphetamine and the term strength is properly applied to the percentage of amphetamine molecules in a given mixture. The defendant presented the testimony of a pharmacist. He gave the structure of a molecule of amphetamine as defined in the United States Dispensatory as $C_9H_{13}N$ and specifying that amphetamine must contain 98% of that formula. The "IP" required not less than 97% of $C_8H_{13}N$. The druggist in speaking of a pill that had to have something to hold it together said that if the pill didn't have 96% to 98% of that formula it wouldn't be amphetamine. It seems apparent the druggist was speaking of the purity required before a substance should be considered as pure amphetamine. His further testimony establishes his opinion that amphetamine can be present even though a substance is not of that purity. For example, he said that if amphetamine is mixed in a dry substance, whether it be caffeine, powdered sugar or anything that is a carrier, the amphetamine is still there. Nevertheless, the defendant

argues that the pills in question were not proscribed "unless the strength of amphetamine is 96 to 98 percent." We do not agree. The appropriate schedule defines the proscribed substance as "any material, compound, mixture or preparation which contains *any* quantity" of amphetamine. (emphasis added) 13 CSR 50–130(1)(B) 3. This is not a case where the substance identified by the chemist was not on the proscribed list as in *State v. Bridges,* 398 S.W.2d 1 (Mo. banc 1966), where the court remanded the case to give the state an opportunity to prove the substance was "a compound or mixture containing the proscribed drug amphetamine itself". This is a case in which a proscribed drug was in compound. No quantitative analysis was required. *State v. Umfleet,* 538 S.W.2d 55 (Mo.App.1976). There was testimony that amphetamine was present in the pill and dust and that presence is sufficient to support the conviction. *State v. Jefferson,* 391 S.W.2d 885 (Mo.1965); *State v. Young,* 427 S.W.2d 510 (Mo.1968). "Even a modicum of the drug in possession is sufficient for conviction." *State v. Kuhrts,* 571 S.W.2d 709, 715 (Mo. App.1978).

■■ Defendant argues that the possibility of the presence of only ½% of amphetamine in the compound means that the state did not present sufficient evidence that the defendant was knowingly, intentionally, and consciously in possession of the controlled substance. He relies upon *State v. Polk,* 529 S.W.2d 490 (Mo.App.1975) in which "traces" of heroin were found in capsules found in the jewel box of one of three persons with whom the defendant rented an apartment in the defendant's name. That case of constructive possession is clearly distinguishable. *State v. Padgett,* 557 S.W.2d 731 (Mo.App.1977). Here it was found the defendant had personal posses-

sion of an envelope containing approximately 100 pills, identical in appearance, from which one pill and the dust were found to contain the controlled substance.[1] The defendant's guilty knowledge can be inferred from the circumstances, including his request of Deputy Smith to destroy the evidence. *State v. Burns,* 457 S.W.2d 721 (Mo. 1970); *State v. Conti,* 573 S.W.2d 95 (Mo. App.1978).

■ The defendant in the closing portion of his brief argues that since the state did not establish the amphetamine strength of the compound, a submissible case was not made because the pills could have been on the exempt list. This contention is not included in his "points relied on" and is not preserved for review. However, this argument has been answered against the defendant by Statute (§ 195.180 RSMo, V.A. M.S.) and decision. The burden to prove an exception was upon the defendant. *State v. Zimpher,* 552 S.W.2d 345 (Mo.App.1977); *State v. Hubble,* 494 S.W.2d 358 (Mo.App. 1973).

■ After the same was heard by the court and counsel in chambers, the state was permitted to play to the jury a portion of a cassette tape recorded by the unit under the couch. This was over the objection of the defendant that extensive portions of the tape were inaudible and unintelligible. That objection is preserved on appeal. This contention has been succinctly answered. "That some portions of the tapes were inaudible does not necessarily render the entire conversation inadmissible; that question was for the trial judge to determine in his discretion." *United States v. Weiser,* 428 F.2d 932, 937 (2nd Cir. 1969). Defendant did not deny making the statements contained on the audible portion of

---

1. In this connection even where a prescribed quantity is an element of the offense, it is not necessarily required that a chemist analyze each pill in the envelope. "But where similar issues involving narcotics have been raised in other jurisdictions, it has been held that where a sample is tested and the evidence reasonably produces a logical and legitimate deduction of the fact required to be proved, a submissible case is made and the issue is one for the jury." *State v. Edwards,* 521 S.W.2d 474, 477 (Mo. App.1975). For a discussion of this topic in a case where tests of 16 out of 1000 pills were found to establish the presence of 200 grams of barbituric acid see *People v. Yosell,* 53 Ill. App.3d 289, 11 Ill.Dec. 184, 368 N.E.2d 735 (1977).

the tape. He admitted he might have said "those words to her" and proceeded to explain why. He made no effort to establish that the tape contained or should have contained anything favorable to him. "In addition, appellant testified and did not deny that he said what was audible on the tapes, and although he stated the recordings were not complete, he did not attempt to point out specific matters favorable to him which were not audible. . . . The trial court properly declined to exclude the tape recordings for this reason." *State v. Spica,* 389 S.W.2d 35, 49 (Mo.1965).

In his motion for new trial and brief the defendant contends the trial court erred in admitting the tape because it had not been produced in response to his request for disclosure. Along the same line, there was evidence photographs were made of what appeared to be a smudged fingerprint on the blue envelope. The photographs were given to Deputy Goodwin. There were no further questions or testimony concerning the smudge or photographs. Also in his motion for new trial and brief, the defendant seeks to convict the trial court of error for not requiring the state to produce the photographs.

The failure of the state to comply with the request for discovery is not to be condoned. However, it does not follow the trial court erred or that the judgment should be reversed. "[I]t was defendant's responsibility to call this failure to the court's attention . . . ." *State v. Davis,* 556 S.W.2d 45, 47 (Mo. banc 1977). The sanction to be imposed is within the discretion of the court. *State v. Davis,* 572 S.W.2d 243 (Mo.App.1978). The trial court did not err in admitting the tape because it had not been produced when no objection was made on that basis. *State v. Lang,* 515 S.W.2d 507 (Mo.1974). The trial court did not err in not requiring the production of the photographs (if they were subject to the rule) when defendant first raised the point in a motion for a new trial. "Allegations of error and a motion for a new trial must be based upon objections made at trial, e. g., *State v. Jones,* 515 S.W.2d 504 (Mo.1974)."

*State v. Gadbury,* 558 S.W.2d 426, 427 (Mo. App.1977). Also *State v. Merritt,* 564 S.W.2d 77 (Mo.App.1978). These contentions of the defendant must be denied.

Defendant's last contention is that the trial court erred in admitting Exhibit 4 because that controlled substance list was not shown to be in force on the date of the offense nor to have been published as required. Exhibit 4 was certified to be "Missouri Controlled Substance List—1975 filed in this office by the Missouri Department of Social Services Division of Health October 1975". The first page of the list is stamped "Refiled March 24, 1976". The certification is dated April 6, 1976. Without specificity defendant asserts that the schedule was not published as required by §§ 536.021 and 536.023 RSMo, V.A.M.S. § 536.021 prescribed in general the procedure required for making, amending or rescinding a rule after the effective date of the act January 1, 1976. § 536.023 provides for the procedure for the numbering, indexing and form of rules. It further required that all rules on file January 1, 1976, which did not conform to the prescribed standards be rewritten and refiled within 90 days and "the rewritten rules shall become effective immediately upon refiling *without* following the provisions of Section 536.021". It was not necessary that the procedures prescribed by § 536.021 be followed upon the refiling of the schedule. Courts may take judicial notice of the Code of State Regulations. § 536.031–[5]. The schedule in question was originally filed January 31, 1972. It was refiled on March 24, 1976. It was not amended between October 18, 1975, and January 13, 1977. The schedule was properly admitted. *State v. Harris,* 564 S.W.2d 561 (Mo.App.1978); *State v. Winters,* 525 S.W.2d 417 (Mo.App.1975). The judgment is affirmed.

All concur.